# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| **NIVINE KAMAL ZAKHARI,** | **CASE NO. 8:25-CV-00848-MSS-NHA** |
| **Plaintiff,** | |
| **v.** | **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| **MICROSOFT CORPORATION,** | **INJUNCTIVE RELIEF SOUGHT** |
| **Defendant.** | |

## NATURE OF ACTION

This is an action under 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and Fla. Stat. §§760.01-760.11 and 509.092, comprising the Florida Civil Rights Act ("FCRA"), to correct unlawful discrimination, harassment, and retaliation on the basis of race, ethnicity, national origin, color, and religion and to provide appropriate relief to Plaintiff who was adversely affected. While this occurred, Plaintiff was also entitled to protection from interference and retaliation under the Family and Medical Leave Act (FMLA), 29 U.S.C. §2601, *et seq.*, for her intermittent leaves of absence.

As alleged with greater detail below, Defendant MICROSOFT CORPORATION failed to enforce its own policies, violating and continuing to violate Section 1981, Title VII, the FCRA, and FMLA by its wanton and reckless disregard of Plaintiff's rights, and retaliating against Plaintiff for raising multiple compliance concerns while employed by Defendant.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981, Title VII and FMLA.

2. Venue lies within United States District Court for the Middle District of Florida, Tampa Division because a substantial part of the events or omissions giving rise to this claim occurred in this Judicial District and is therefore proper pursuant to 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff, NIVINE KAMAL ZAKHARI (hereinafter as "Plaintiff"), is a resident of Hillsborough County, Florida, and an employee of Defendant from January 2011 to September 2025 within the meaning of Section 1981, Title VII, the Florida Civil Rights Act ("FCRA"), Family and Medical Leave Act (FMLA), and related statutes.

4.      Plaintiff is a member of The Florida Bar and admitted to practice in this Court, although her employment did not involve the practice of law for Defendant or Defendant's customers.

5.      Plaintiff is proceeding *pro se*, but may retain counsel to represent her, and others similarly situated, for which she will be obligated to pay a reasonable fee for their services.

6.      Defendant, MICROSOFT CORPORATION (hereinafter as "Defendant"), is a foreign corporation headquartered in Redmond, Washington, authorized and doing business in this Judicial District.

## CONDITIONS PRECEDENT

7.      More than thirty days prior to the institution of this lawsuit, Plaintiff filed a Charge of Discrimination (the "Charge") with the EEOC numbered 511-2024-02357 on May 16, 2024 alleging that Defendant discriminated against her on the basis of race, ethnicity, national origin and religion, in violation of Title VII (Exhibit A).

8.      After several months of investigation, the EEOC declined to proceed further without making a determination on the merits and Plaintiff received Notice of Right to Sue on February 3, 2025 (Exhibit B).

9.     All conditions precedent to the institution of this lawsuit have been fulfilled related to claims under Title VII.

## FACTUAL ALLEGATIONS

10.     Plaintiff was born in the United States and is of Middle Eastern & North African (MENA) descent, as her parents were both native Egyptian Coptic Christians who immigrated to the U.S. several years before her birth.

11.     Plaintiff attended K-12 schools in Florida, was recognized as a National Merit Scholar, and attended college at the University of Houston where she studied Industrial Engineering from 1990 to 1996, completing both bachelor's and master's degrees.

12.     Plaintiff later returned to study law at the University of Houston Law Center from 2003 to 2006 and was admitted to the State Bar of Texas in 2006 (#24052028), followed by The Florida Bar in 2008 (#48825).

13.     Plaintiff began her employment with Defendant on January 24, 2011, as an engineer based in Texas, and soon relocated back to Florida in 2012 as she assumed more caregiving responsibilities for her elderly parents.

14.     Historically, persons of MENA descent were considered "White" for Federal reporting purposes.[1]  However, the U.S. Office of Management and Budget (OMB) recently approved a separate MENA designation, comprising multiple ethnic and ethnoreligious groups in the region, including Egyptian Coptic Christians, Israeli Jews, Druze, Kurds, Chaldeans, and Persians, among others.[2]

15.     Since at least May 2015, Plaintiff informed Defendant of her disagreement with being categorized as White for company D&I and US Federal EEO reporting purposes, particularly when coworkers, customers, and partners implicitly behaved or explicitly stated their assumption that she was not White, primarily based on her color.[3]

---

[1] See generally U.S. Census Bureau, "About the Topic of Race," at https://www.census.gov/topics/population/race/about.html (last revised Dec. 20, 2024) noting: "The U.S. Census Bureau must adhere to the 1997 Office of Management and Budget (OMB) standards on race and ethnicity which guide the Census Bureau in classifying written responses to the race question: White – A person having origins in any of the original peoples of Europe, the Middle East, or North Africa."

[2] See Dr. Karin Orvis, "OMB Publishes Revisions to Statistical Policy Directive No. 15: Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity," Mar. 28, 2024, available at https://bidenwhitehouse.archives.gov/omb/briefing-room/2024/03/28/omb-publishes-revisions-to-statistical-policy-directive-no-15-standards-for-maintaining-collecting-and-presenting-federal-data-on-race-and-ethnicity/ (last visited Apr. 6, 2025). See also "What Updates to OMB's Race/Ethnicity Standards Mean for the Census Bureau," Apr. 8, 2024, available at https://www.census.gov/newsroom/blogs/random-samplings/2024/04/updates-race-ethnicity-standards.html (last visited Apr. 6, 2025).

[3] See generally Karen Humes, Roberto Ramirez, Nicholas Jones, Merarys Rios, Angela Buchanan, Rachel Marks, "Forum on Ethnic Groups from the Middle East and North Africa," US Census Bureau, May 29, 2015, at https://www.census.gov/library/working-papers/2015/demo/2015-MENA-Experts.html

16.     Other aspects of Plaintiff's perceived identity did not always align with her self-identification, and the disparate treatment and harassment she frequently encountered as a racially and ethnically ambiguous woman of color was sometimes motivated by mistaken assumptions about her race, ethnicity, national origin, and/or religious beliefs more than her actual self-identification as a second-generation Egyptian-American Christian.

17.     Plaintiff subsequently requested Defendant reclassify her as "Multiracial" and that a MENA ERG be recognized by Defendant.  At the time, Defendant's HR D&I team, through Karen Smith, indicated they had no plans to support a MENA classification or ERG until it was required by the US Government.

18.     In October 2016, following a White House announcement of new signatories to the Equal Pay Pledge,[4] Plaintiff requested an Equal Pay Review (Case # HR-3007415-T6Y9P6) "for possible inequities with [her] peers based on both gender and racial classification (MENA)."  The comparators identified at the time were White and Asian men and a White woman hired for the same role as Plaintiff's, a Presales Architect, under the same manager, Jasone Cerasia, but at a higher level (Principal v. Senior).

---

[4] The White House, Fact Sheet: White House Announces New Commitments to the Equal Pay Pledge, Aug, 26, 2016, at https://obamawhitehouse.archives.gov/the-press-office/2016/08/26/fact-sheet-white-house-announces-new-commitments-equal-pay-pledge , noting Microsoft was one of the signatories.

19.     Defendant denied there was any disparate treatment or unequal hiring standards based on gender, race or ethnicity (and where color was also as an implicit distinction to White comparators) and closed the case.

20.     In 2018, Defendant made Diversity & Inclusion a "Core Priority" for all employees, upon which their performance would at least be partially assessed for FY19.   This called for "Active and visible participation in communities for marginalized groups and their allies" and "Regularly practicing the ten inclusive behaviors and encouraging others to do the same, particularly with customers and partners."[5]

21.     Senior leaders were also incentivized to increase the diversity of their teams, with specific demographics prioritized for such incentives.[6]

---

[5] Microsoft FY19 Connect form indicating "Core Priorities are the primary, long-term accountabilities for your role, including your primary areas of focus and the targeted business impact. These are generally broader than specific actions or deliverables and longer-term than the span of time between Connects. They are simple statements, two or three sentences each, that include what you are going after (on the left) and the most critical indicators of success (on the right)." On the left, " Our Company-wide shared core priority: To realize our mission to empower every person and organization on the planet to achieve more, each and every one of us must help create a diverse and inclusive culture where everyone can bring their full and authentic self, where all voices are heard, and where we do our best work as a result. With this priority, personally commit to be an active and intentional participant in creating a diverse and inclusive Microsoft.

Visit HRweb to understand more about how you can activate the shared core priority."

[6] Microsoft, "2024 Global Diversity & inclusion Report," Oct. 23, 2024, at https://aka.ms/2024-DIReport, noting one of the highlights from 2007-2017 was "Add[ing] a performance-based component around culture and organizational leadership, which includes progress on D&I representation, to the compensation of every member of the Senior Leadership Team," at 7.

Plaintiff became aware of efforts by hiring managers to recruit these specific demographics, sometimes at the expense of other more qualified candidates.[7]

22.    Plaintiff expressed her opposition to these types of D&I efforts to her management chain, including Chris Sloyan, as Plaintiff believed they undermined meritorious but underrepresented talent, particularly when some managers and senior leaders openly shared their willingness to exclude qualified candidates and current employees from opportunities based on their identity.

23.    On one of these occasions, during a Culture and D&I call Plaintiff hosted, one of these leaders, Stephen Barnes, stated he no longer wanted to recruit more white men. Plaintiff objected during and after the call, and although he later apologized for expressing this sentiment, Plaintiff believed his intent remained.

24.    With Defendant being a Federal contractor, Plaintiff believed these practices also raised additional compliance concerns.  Accordingly, Plaintiff minimized her involvement with leaders and initiatives Plaintiff believed to be non-compliant with Defendant's stated policies and applicable Federal laws and regulations.

---

[7] Microsoft's most recent D&I report summarized representation in the US with 7 categories for Asian, Black & African American, Hispanic & Latinx, Native American & Alaska Native, Native Hawaiian and Pacific Islander, White, and Multiracial.  See https://aka.ms/2024-DIReport at 11.

25.    In September 2020, Plaintiff once again requested an Equal Pay Review (Case #HR-6650168-B4S7F1) related to her FY20 annual rewards and promotion velocity.   The comparators identified at the time were Black, Hispanic, White and Asian men and women hired at or promoted into the same role as Plaintiff's, a Customer Success Manager (later, Cloud Solution Architect), and reporting into the same organization of her recent manager, Wes Anderson, but at a higher level (Principal v. Senior).

26.    Defendant once again denied there was any disparate treatment or unequal performance standards based on her gender, race or ethnicity (and where color was also an implicit distinction to the White comparators) and closed the case.

27.    The following year, in September 2021, with her FY21 rewards, Plaintiff was promoted to Principal– a full 5 years after Defendant's reported Equal Pay Pledge.

28.    In November 2021, given well-documented concerns regarding Defendant's ineffective enforcement of its sexual harassment and gender discrimination policies, shareholders overwhelmingly approved a proposal to "release a transparency report … to shareholders assessing the effectiveness of the company's workplace sexual harassment policies, including the results of

any comprehensive, independent audit/investigations, analysis of policies and practices, and commitments to create a safe, inclusive work environment."[8]

29.     On November 15, 2022, Defendant released an action plan following independent review of the company's sexual harassment and gender discrimination policies and practices, with some of the additional reviews and improvements not scheduled for completion until June, 2023.[9]

30.     Soon afterwards, Plaintiff sought volunteers to renew efforts to establish a MENA ERG for Defendant's employees, based on the inclusive definition of MENA proposed and eventually adopted by the OMB.

31.     Plaintiff hosted a call in April 2023 to raise awareness of the planned changes in US demographic reporting and identify volunteers aligned with that definition for the MENA community over the summer so they could launch a more organized community in FY24.

32.     Plaintiff soon recognized some of the volunteers did not actually support an inclusive MENA group, as they began taking steps to circulate increasingly antisemitic content, inviting external speakers with openly

---

[8] Microsoft Form 8-K, November 30, 2021, available at https://microsoft.gcs-web.com/node/30136/html, showing ~78%approval for "Shareholder Proposal: Report on effectiveness of workplace sexual harassment policies" at Defendant's annual meeting.

[9] Microsoft, "Building a more inclusive workplace: Microsoft releases action plan following independent review," *Microsoft Corporate Blogs*, Nov. 15, 2022, at https://blogs.microsoft.com/blog/2022/11/15/building-a-more-inclusive-workplace-microsoft-releases-action-plan-following-independent-review/

antisemitic viewpoints, and excluding Israeli and Jewish members from the community.

33.     Plaintiff reported her concerns to Defendant multiple times, as some of the volunteers insisted on operating in a manner that conflicted with Defendant's stated values and goals for ERGs,[10] in addition to its own published Anti-Discrimination and Anti-Harassment policies.[11]

34.     On July 18, 2023, Plaintiff was recognized for the FY23 Platinum Club award, which is Defendant's "premier award program recognizing and rewarding individuals who consistently exhibit an unwavering commitment to delivering exceptional results that directly contribute to the company's ongoing success."[12]

35.     On October 7, 2023, Plaintiff was returning home from the company sponsored Platinum Club Award trip when she started to see initial reports of the situation unfolding in Israel & Gaza.[13]

---

[10] See generally "Microsoft Global Diversity & Inclusion," at https://www.microsoft.com/en-us/diversity/inside-microsoft/default (last visited Apr. 6, 2025).

[11] See generally "Building a more inclusive workplace: Microsoft releases action plan following independent review," Nov. 15, 2022, at https://blogs.microsoft.com/blog/2022/11/15/building-a-more-inclusive-workplace-microsoft-releases-action-plan-following-independent-review/ (last visited Apr. 6, 2025).

[12] Microsoft Platinum Club Award Letter, July 18, 2023 (Exhibit C).

[13] See generally Dan Williams, "How the Hamas attack on Israel unfolded," Reuters, Oct. 7, 2023, at https://www.reuters.com/world/middle-east/how-hamas-attack-israel-unfolded-2023-10-07/ (last visited Apr. 6, 2025).

36.     Employees began expressing their views on the conflict across multiple internal communications channels and repeatedly asked Defendant's Senior Leadership Team to take action to support those impacted by the recent events, beyond the short public statements that were made.[14]

37.     Some of most active participants in the MENA community were advocating for extreme views that were not inclusive or aligned with the goals of the potential ERG.

38.     Plaintiff notified Defendant of her concerns with proceeding with the potential ERG formation given recent events and paused further activity in the MENA group originally created in December 2023.

39.     By January 2024, Defendant allowed some of the remaining MENA community leaders to continue with a separate MENA community that claimed to be inclusive but was primarily being used to amplify the viewpoints of its Palestinian, Arab, and Muslim members.

40.     On January 23, 2024, Plaintiff shared information from the EEOC internally and externally on social media regarding Anti-Arab, Anti-Middle Eastern, Anti-Muslim, and Antisemitic workplace discrimination and informed

---

[14] See, e.g., Kathleen Hogan, "Microsoft employee announcement regarding the attack on Israel," October 10, 2023, at https://blogs.microsoft.com/blog/2023/10/10/microsoft-employee-announcement-regarding-the-attack-on-israel/ (last visited Apr. 6, 2025).

her manager, Chris Sloyan, that she believed charges would be filed against Defendant given recent events.[15]

41.    Defendant's recognition of this alternative MENA community has emboldened protesters in the company who frequently use companywide channels, particularly Viva Engage[16] and large email distribution lists, to reach thousands of employees globally with their political viewpoints, in addition to disrupting events on campus and at major conferences with customers and partners attending, to amplify extremist propaganda and hate speech.[17]

42.    Defendant's inaction also emboldened current and former members of this alternate MENA community to ambush participants and their

---

[15] See EEOC, Jan. 23, 2024, at https://x.com/USEEOC/status/1749861705738330260, which was publicly reposted by Plaintiff and providing information from https://www.eeoc.gov/anti-arab-anti-middle-eastern-anti-muslim-and-antisemitic-discrimination-are-illegal and https://www.eeoc.gov/filing-charge-discrimination

[16] Viva Engage (formerly Yammer) is a companywide social messaging platform that includes not only 200k+ full-time employees of Defendant, but another 200k+ business partners and guests for a total reach of over 400k people where communities are visible to the entire network. See generally "Introducing Microsoft Viva Engage," Sep. 10, 2024, available at https://learn.microsoft.com/en-us/viva/engage/overview (last visited Apr. 6, 2025).

[17] See, e.g., Matt O'Brien, "Microsoft fires employees who organized vigil for Palestinians killed in Gaza," *AP News*, Oct. 26, 2024, at https://apnews.com/article/microsoft-fired-workers-israel-palestinians-gaza-72de6fe1f35db9398e3b6785203c6bbf (last visited Apr. 6, 2025). See also Joel Moreno, "Former Microsoft employees claim retaliation after being fired over Palestinian vigil," *KOMO News*, Nov. 1, 2024, at https://komonews.com/news/local/former-microsoft-employees-claim-retaliation-after-being-fired-over-palestinian-vigil-google-israel-palestine-palestinian-military-victims-war-gaza-hamas (last updated Nov. 2, 2024) reporting: ""We are demanding that Microsoft stop providing the Israeli military with the technology to commit an ongoing genocide against Palestinians," said a current Microsoft employee who spoke at the press conference but did not want to be identified.  No Azure for Apartheid is circulating a public petition to end sales of Azure cloud and AI services to the Israeli military. The petition also calls for more employee protections against discrimination."

managers in meetings and events and perpetuate false and defamatory narratives about these employees to achieve their social and political goals.

43. After notifying Defendant on multiple occasions of the problematic behavior encountered and observed, Plaintiff filed a Charge of Discrimination with the EEOC on May 16, 2024 (Exhibit A).

44. The Charge cited multiple HR cases representative of the problematic behavior encountered between October 2023 and March 2024, while additional complaints were also made directly to managers, HR, and WIT.[18]

45. HR-9929852-X0R4M6, Oct. 26, 2023, requested review of a post on the Viva Engage network that included a video of Palestinians celebrating after 9/11 that was later deleted.

46. HR-9932135-X0X0K3, Oct. 27, 2023, requested clarification on how content is reviewed for Anti-Arab and Anti-Muslim bias on the network. Representative content was shared that some perceived as Anti-Arab or Anti-Muslim, and further clarification of the guidelines being used to determine whether they should be shared on Viva Engage was requested.

---

[18] Cited HR cases from the EEOC Charge included HR-9929852-X0R4M6, HR-9932135-X0X0K3, HR-9963144-M5N6R1, HR-9967541-4B9V8, HR-9967546-B3S6N3, HR-9983165-M1J0V1, HR-10135856-P3X7N2, HR-10183419-L6P5S1, HR-10186059-G1J5L8, HR-10210791-D6W1W4, HR-10239545-H8W9L4, and HR-10255016-Y3K7R3.

47.     HR-9963144-M5N6R1, Nov. 9, 2023, requested additional guidance on how best to address disruptive behavior across Viva Engage (Yammer) & Teams.  There were more situations where users were openly refusing to abide by established community guidelines and efforts by others to redirect the content so it does not disrupt more people unnecessarily.

48.     HR-9967541-4B9V8, Nov. 13, 2023, requested clarification on addressing posts and comments that more directly showed support for foreign terrorist organizations like Hamas.

49.     HR-9967546-B3S6N3, Nov. 13, 2023, requested HR vetting of employee community volunteers like other ERGs.  There were concerns that some of them may not be operating consistent with company and community guidelines and policies that was not conducive to an inclusive and respectful environment.

50.     HR-9983165-M1J0V1, Nov. 19, 2023, requested additional review of how the MENA at Microsoft (MENAAM) LT members were selected and how to effectively enforce role requirements and performance expectations. This led to a few discussions with HR D&I Employee Community Engagement leads, Karen Smith and Sophia Dalce, the former whom declined to get involved in enforcement actions related to the misuse of the communities and problematic behavior by community leaders, including their attempts to

redefine MENA by explicitly excluding Israel and only supporting Palestine. This enabled the creation of the alternate MENA Community in January 2024, along with a "MENA Roundtable" group supporting employees and conduct that eventually also led to the formation of the No Azure for Apartheid (NOAA) group in May 2024.

51.     HR-10135856-P3X7N2, Jan. 28, 2024, requested review of comments made on Viva Engage in support of the Houthi Red Sea attacks.

52.     HR-10183419-L6P5S1, Feb. 16, 2024, requested review of a problematic thread on Viva Engage where a Palestinian supporter demanded action against Israeli employees who "may be endorsing genocide, terrorism, misinformation, [and] ethnic cleansing, as a result of nationalistic views."

53.     HR-10186059-G1J5L8, Feb. 17, 2024, requested review of a problematic thread on Viva Engage where a Palestinian supporter demanded DNA testing of an Israeli because they did not "look indigenous."

54.     HR-10210791-D6W1W4, Feb. 27, 2024, requested review of emails broadly distributed to employees promoting initiatives from organizations with antisemitic and extremist views, including Students for Justice in Palestine and Jewish Voice for Peace.

55.     HR-10239545-H8W9L4, Mar. 10, 2024, requested review of a thread on the topic of sexual violence as a weapon of war that was moved to a

private group due to concerns about denialism and lack of more effective trigger warnings in the platform.

56. HR-10255016-Y3K7R3, Mar. 15, 2024, requested review of several threads created by a LinkedIn employee expressing antisemitic views, harassing Israeli participants and others perceived to be Zionist.

57. HR-10403688-W0D3Y6, May 15, 2024, requested further review of Viva Engage posts and emails broadly distributed to employees promoting initiatives from organizations with extremist views and asking employees to sign the NOAA petition. NOAA's social media channels continued to amplify resources from organizations like Students for Justice in Palestine and Samidoun network affiliates.

58. Plaintiff also met with HR regularly as part of her administrative responsibilities to review problematic threads across multiple groups she co-owned on the Viva Engage network with public group visibility to approximately 419,000 users at the time (employees and invited business guests).

59. During one of these meetings with Chris Maulden, Plaintiff was asked not to create more HR cases, but to just email or direct message the HR contacts directly. This made it more challenging to quantify the total number of complaints and volume of problematic content across all channels.

60.     During the period Nov 2023 to May 2024, there were over 7,300 messages posted in the "Middle East News Discussion" (MEND) Group alone. This subjected Plaintiff to relentless harassment and abuse for attempting to enforce the established community guidelines in the groups she managed, given the significant platform limitations for community admins at the time.

61.     Defendant failed to take appropriate measures to stop the ongoing bullying, harassment, discrimination, intimidation, and defamation by employees misusing these company resources, and flouting company policies and established community guidelines to achieve their social and political goals, particularly through online "brigading" that became apparent after reviewing related analytics for some of the most active users.[19]

62.     This further compounded concerns Plaintiff had previously reported about disparate treatment based on her perceived identity.  By January 2024, Plaintiff noted she was no longer invited to meetings she had previously participated in and work she was previously managing, like a

---

[19] See, e.g., Tony Blair Institute for Global Change, Social Media Futures: What Is Brigading?, Mar. 10, 2021, at https://institute.global/insights/tech-and-digitalisation/social-media-futures-what-brigading noting ""Brigading" is a term that originated on Reddit for a coordinated attack by a group of users of an antagonistic subreddit (forum dedicated to a particular topic). The brigade would privately agree to "downvote" comments, either on a random or targeted basis, to deprioritise them in users' feeds and effectively censor them. The meaning of the term expanded to cover all coordinated voting behaviour to make something or someone seem more or less popular than they actually are, and now it means all coordinated abusive engagement behaviour online. This engagement can come in the form of retweets, comments, quote retweets, email campaigns and more."

recurring call series for customers, was being transitioned to other team members, all of whom were White, and some of whom had been disrespectful and condescending to her on multiple occasions.  When Plaintiff objected to this kind of bullying and disrespectful behavior that undermined her position, she was labeled "high-conflict."

63.    By May, Plaintiff reached out to another community she had historically been involved in, Technical Women at Microsoft (TWaM), to ask for suggestions on dealing with the frequent disrespect and marginalization.

64.    After relaying these concerns to her manager, Chris Sloyan, and skip-manager, LJ Marinello, Plaintiff started to receive feedback critical of her tone and negativity.  On May 28, 2024, less than 2 weeks after filing the Charge of Discrimination, the Manager feedback in her Connect included the following statement: "I have received feedback from our leadership that you can be overly negative in your comments at times and that your ability to tolerate people who do not think like you or do not enjoy the same level of intellect that you do could use some work."

65.    Soon afterwards, another investigation was opened to review Plaintiff's complaints about the bullying, harassment, and disparate treatment she was experiencing.  The comparators identified at the time were White and Asian men hired at or promoted into the same role as Plaintiff's, a Principal

Cloud Solution Architect, but some were given "Chief Architect" titles and/or presumed to be more technically qualified than Plaintiff so they had more opportunities to lead organization-wide technical initiatives, and often excluded Plaintiff while doing so. Once again, Defendant denied the problem and closed the case on August 12, 2024.

66. The very next day, August 13, 2024, Plaintiff was subjected to more gaslighting and bullying from multiple managers, including Chris Sloyan, Pam Carr, Sandra Bragdon, and LJ Marinello, who refused to acknowledge the disparate treatment that had historically occurred in the organization, mischaracterizing Plaintiff's demeanor as "angry" and "defensive" and further "tone policing" her to justify their negative feedback.

67. On August 19, 2024, Plaintiff requested intermittent personal medical leave through January 3, 2025 to address a condition requiring major surgery and potentially extended recovery.

68. Before her expected surgery, Plaintiff once again requested a review of how she was being treated, particularly by her managers, Chris Sloyan and LJ Marinello, given the pending EEOC investigation and escalating toxicity of the work environment.

20

69.     Once again, Defendant denied there was any disparate treatment based on her race or ethnicity (and where her color was also an implicit factor) and closed the case on September 10, 2024.

70.     While recovering from surgery, Plaintiff was impacted by two hurricanes in Florida, Helene on September 26 and Milton on October 9, and took paid emergency leave of 10 days offered by Defendant to address disaster recovery for herself and her family.

71.     By November 12, 2024, Plaintiff attempted to resume her work schedule so she could ramp back up to full-time in January.

72.     The following week, Plaintiff's manager, Chris Sloyan, submitted a Connect on November 19, 2024 that continued to mischaracterize her August interactions, misrepresent Plaintiff's technical readiness, and perpetuate a false narrative across teams managed by both Chis Sloyan and Pam Carr to justify further unequal treatment and marginalization of Plaintiff.

73.     By December 2024, Plaintiff was informed that custom reports were being used for mid-year reviews that referenced attainment metrics for individual contributors based on a form of utilization that did not factor in protected time away, such as FMLA or disaster leave.   Plaintiff was unsurprisingly at the bottom of these custom performance reports due to her

21

medical and disaster leaves and her manager, Chris Sloyan, indicated that would be a problem for her in subsequent performance reviews.

74.  Plaintiff informed her manager, Chris Sloyan,  that she believed that was unlawful retaliation and wanted more details on who authorized the use of those metrics for performance reviews, but he could not provide those details.

75.  By January 15, 2025, while meeting with her skip-manager, LJ Marinello, Plaintiff was informed that her overall attainment was 36% based on this form of utilization her skip-manager could not explain.  Plaintiff informed her she was opening an HR case immediately to review such metrics when they do not respect protected time away.

76.  Plaintiff also posted the question to a Senior Leadership forum visible to all of Defendant's employees to understand how widespread such tactics were across the company, effectively penalizing anyone in a billable role who had taken a leave of absence.  She referenced recent reporting to understand how managers could be abusing their discretion to create metrics that recklessly violate employee rights to justify an underperformance narrative to accomplish their attrition goals.[20]

---

[20] Ashley Stewart, "Microsoft is planning job cuts and focusing more on underperforming employees," *Business Insider*, Jan. 7, 2025, at

22

77. On February 14, 2025, Plaintiff received confirmation from Defendant's HR team that the individual metrics used by her manager, Chris Sloyan, and skip-manager, LJ Marinello, were not appropriate and her GM, James Rarick, and VP, Javier Vasquez, would reinforce that across the organization.

78. On February 26, 2025, during a roundtable with her GM, James Rarick, his business manager, Sandra Bragdon, and several teammates, Plaintiff raised the concern again about the perception that people who take leave are underperforming and "not pulling their weight" and other team members had to pick up the slack to meet a team target that does not factor in protected time away. The GM, James Rarick, said that should not be an issue. However, Plaintiff informed him that managers in the organization continued to reference these metrics in a way that discourages employees from taking time away for fear of being penalized and labeled an underperformer.

79. This was evident in subsequent organizational town halls where high performers in roles like Plaintiff's were recognized based on their availability to work more hours and deliver more engagements. As this accumulated through the fiscal year, employees like Plaintiff who took leave at

---

https://www.businessinsider.com/microsoft-plans-job-cuts-performance-management-2025-1

any point recognized their year-to-date metrics carried an unrecoverable deficit.

80. This continuing practice was implicitly discouraging employees from taking leave they were entitled to, including Plaintiff, who delayed her intermittent Family Caregiver Leave request until March 31 to July 4, when it became apparent she would need to manage more of her mother's care.

81. On March 31, 2025, Plaintiff's manager, Chris Sloyan, posted an out-of-band Connect containing numerous false statements in retaliation for reporting multiple ongoing compliance concerns that remained unaddressed. This false narrative was used to justify Plaintiff's first LITE (Lower Impact than Expected) which usually triggers the performance management process.

82. On May 7, 2025, Plaintiff's manager, Chris Sloyan, once again posted a Connect containing numerous false statements in retaliation for reporting multiple ongoing compliance concerns that remained unaddressed. This false narrative was used to justify Plaintiff's second LITE at which point she was offered a Voluntary Separation Agreement (VSA) or continue working under a Performance Improvement Plan (PIP).

83. Plaintiff opted for the PIP, which cited "Collaboration" and "Conflict Resolution" as the areas of deficiency, and required scheduling conversations within a 2 week window from May 15 to May 30, 2025, with

managers in the organization, including Stephen Barnes, Aja Hill, Bonnie Jones, and Pam Carr, who engaged in activities Plaintiff had previously expressed opposition to and continued to have outstanding compliance concerns about.

84.     While Plaintiff completed the required calls as requested, the associated evaluation submitted on May 28, 2025 by her manager, Chris Sloyan, once again was filled with mischaracterizations and falsehoods to justify further adverse action.

85.     On June 9, 2025, Plaintiff's manager, Chris Sloyan, sent a teamwide email asking people to bill a minimum of 32 hours per week to meet team targets.  This once again showed disregard for employees' protected time away, and reinforced the perception that employees are underperforming when they need to take leave.

86.     Plaintiff once again reported the issue to HR (Case # HR-11395933-P1K0J2) and even though a clarification email was sent by Plaintiff's manager, Chris Sloyan, later that month and reminder given to their VP, Javier Vasquez, the damage had already been done.  That case was closed by HR on July 9.

87.     Defendant's failure to act has enabled an undeniably hostile work environment to take root and flourish, with foreseeably more severe incidents

occurring during some of the most significant company events, such as a live companywide town hall on February 25th, 2025, and the 50th Anniversary Celebration on April 4th, 2025, where protesters disrupted speakers including a President, Co-Founder, former CEO, and current CEO.[21]  These protesters subsequently circulated wide-reaching emails and stories with media outlets that carried more footage of not only the event disruption, but the protest crowd near the venue.[22]

88.   On August 20, 2025, 20 protesters, including current and former employees of Defendant, were reportedly arrested at its Redmond campus on charges including trespassing, malicious mischief, and resisting arrest.[23]

---

[21] See "Microsoft employees protest at 50th anniversary party over Israel contract," *AP News*, Apr. 4, 2025, at https://www.msn.com/en-us/news/world/pro-palestinian-protester-interrupts-microsofts-50th-anniversary-party-over-israel-contract/ar-AA1Ck1gH?ocid=BingNewsSerp. See also "Microsoft workers protest sale of AI and cloud services to Israeli military," *AP News*, Feb. 25, 2025, at https://apnews.com/article/israel-palestinians-ai-technology-microsoft-gaza-lebanon-90541d4130d4900c719d34ebcd67179d.

[22] See Tom Warren, "Microsoft's 50th birthday got interrupted by employees protesting," *The Verge*, Apr. 4, 2025 at https://www.theverge.com/news/644027/microsoft-50th-anniversary-protest reporting: "Microsoft held a special 50th anniversary event at its headquarters earlier today. During Microsoft AI CEO Mustafa Suleyman's presentation, a Microsoft employee interrupted the event to protest the use of Microsoft's technologies in Israel's war against Hamas. A second employee interrupted the event later on, while CEO Satya Nadella, co-founder Bill Gates, and former CEO Steve Ballmer were discussing 50 years of Microsoft."

[23] Todd Bishop, "Microsoft calls protest a 'destructive' act by outsiders; group alleges police brutality in arrests," *GeekWire*, Aug. 22, 2025, *at* https://www.geekwire.com/2025/microsoft-calls-protest-that-led-to-20-arrests-a-destructive-act-by-outsiders-group-alleges-police-brutality/ and "Protesters set up temporary encampment at Microsoft to pressure company on Israel contracts," Aug. 19, 2025, *at* https://www.geekwire.com/2025/protesters-set-up-temporary-encampment-at-microsoft-hq-to-pressure-company-on-israel-contracts/ publicly reporting on escalating

89.    On August 26, 2025, 7 protesters, including current and former employees of Defendant, were reportedly arrested for occupying its President's office, causing one of its Redmond campus buildings to be locked down until local police could remove and arrest them.[24]

90.    This is in addition to protests by current and former employees of Defendant in front of senior executives' homes, including the President, CEO, and a Corporate Vice President.[25] that have been acknowledged by recent Defendant statements to the press.[26]

---

protests by "[m]embers of the No Azure for Apartheid group, which includes current and former Microsoft employees, [who] allege that the company's technology is being used in the surveillance, starvation and killing of Palestinians in Gaza."

[24] Todd Bishop, "Protesters occupy Microsoft president's office at Redmond HQ in latest action over Israel contracts," *GeekWire*, Aug. 26, 2025, at https://www.geekwire.com/2025/protesters-occupy-microsoft-presidents-office-at-redmond-hq-in-latest-action-over-israel-contracts/ and "Microsoft President Brad Smith reclaims his office to address infiltration, protests, Israel contracts," Aug. 26, 2025, *at* https://www.geekwire.com/2025/microsoft-president-brad-smith-reclaims-his-office-to-address-infiltration-protests-and-israeli-contracts/ publicly reporting on escalating protests targeting Microsoft senior executives, including "[t]he infiltration and occupation of Smith's office follow[ing] a turbulent week on Microsoft's campus. Last Wednesday, 20 people were arrested after demonstrators occupied a plaza at the company's East Campus, poured red paint on a Microsoft sign, and blocked a nearby bridge.  Protesters even took to Lake Washington in kayaks on Sunday, where they gathered in front of the waterside homes of Smith and Nadella, chanting and displaying large banners which read, "Microsoft Kills Kids" and "Satya + Brad = War Criminals.""

[25] Todd Bishop, "Protesters set up temporary encampment at Microsoft to pressure company on Israel contracts," Aug. 19, 2025, *at* https://www.geekwire.com/2025/protesters-set-up-temporary-encampment-at-microsoft-hq-to-pressure-company-on-israel-contracts/ noting "Earlier this month, the group staged a loud protest outside the home of a Microsoft executive — pouring red paint on the sidewalk symbolizing blood, and accusing the executive of being complicit in killing children in Gaza, according to video clips from the protest."

[26]Microsoft, "Press conference on August 26," *Microsoft Corporate Blogs*, Aug. 26, 2025, at      https://blogs.microsoft.com/on-the-issues/2025/08/26/press-conference/      and

91. These protests, supported by current and former employees, continue to occur as recently as November 18, 2025, during the Microsoft Ignite annual conference at the event venue in San Francisco, at the Redmond campus, and virtually through circulation of an employee's resignation email.[27]

92. Plaintiff is not alone in her concern that these increasingly visible and hostile protests in front of some of the Defendant's top executives and at locations beyond the main corporate campus present a security risk, both physically and virtually, to herself and other employees, contractors, partners, and customers.

93. Defendant's inability to sufficiently discipline some of the most visible and frequent instigators in these events goes beyond concerns of harassment, discrimination, and a hostile work environment, to plausible

---

https://www.youtube.com/live/T6tl7KoIVgA also covered by Todd Bishop, "Microsoft President Brad Smith reclaims his office to address infiltration, protests, Israel contracts," *GeekWire*, Aug. 26, 2025, *at* https://www.geekwire.com/2025/microsoft-president-brad-smith-reclaims-his-office-to-address-infiltration-protests-and-israeli-contracts/ and "Microsoft President Brad Smith speaks after office occupation," Aug. 26, 2025, *at* https://www.youtube.com/watch?v=w92jarccnrg and "Protesters deny planting listening devices inside Microsoft exec's office; company fires four workers," *GeekWire*, Aug. 29, 2025, *at* https://www.geekwire.com/2025/protesters-deny-planting-listening-devices-inside-microsoft-execs-office-company-fires-four-workers/.

[27] See, e.g., Alex Halverson, "Microsoft critics say complaints about Israel work go 'into a void,'" *The Seattle Times*, Nov. 18, 2025, at https://www.seattletimes.com/business/microsoft/microsoft-critics-say-complaints-about-israel-work-go-into-a-void/ , Ayah Ali-Ahmad, "Protests at Microsoft Conference Target Tech Giant's Ties With Israeli Military," KQED, Nov. 19, 2025, at https://www.kqed.org/news/12064555/protests-at-microsoft-conference-target-tech-giants-ties-with-israeli-military , and No Azure for Apartheid, "Departure — A letter by Patrick Fort," Nov. 19, 2025, at https://medium.com/@noazureforapartheid/departure-a-letter-by-patrick-fort-608997292d78.

concerns of more significant business disruptions and escalating harm occurring, including hate crimes.[28]

94.     Defendant terminated Plaintiff's employment on September 2, 2025, citing "performance reasons" related to the protected activity described herein.[29]   Namely, Plaintiff's good faith opposition to Defendant's unlawful D&I practices, reporting such practices to the appropriate internal channels and external authorities, reporting ongoing retaliation because of this protected activity, and reducing her engagement with leaders who continued to enable them.

95.     Plaintiff remains active in the Microsoft Partner ecosystem and employee alumni groups, where concerns remain about escalating harm occurring due to the hostile work environment.

## STATEMENT OF CLAIMS

### Count I: Discrimination in Violation of Section 1981

96.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

---

[28] See, e.g., Fla. Stat. 784.0493 "Harassment or intimidation based on religious or ethnic heritage" part of House Bill 269, the "Public Nuisances" bill, signed into Florida law on May 1, 2023.  Also see generally Nivine K. Zakhari, "Count MENA: Clarifying the Impact of U.S. Hate Crimes on the Middle Eastern & North African Community," Johns Hopkins Scholarship Government Analytics Collection, Dec. 2021, available at https://jscholarship.library.jhu.edu/items/8eb41d2f-3a67-4327-8438-9899f5aed902.

[29] See Termination Memo dated Sep. 2, 2025 (Exhibit D)

29

97.     Defendant discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by, *inter alia*, interfering with her ability to continue performing at the level she had reached by reassigning some of her work to other team members to progressively exclude and isolate her to effectively "manage her out."

98.     Defendant discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by, *inter alia*, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

99.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary, economic, and reputational harm, for which she is entitled to an award of damages.

100.    As a direct and proximate result of Defendant's unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages and other relief.

101. Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton or recklessly indifferent violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## Count II: Retaliation in Violation of Section 1981

102. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

103. Defendant retaliated against Plaintiff by, *inter alia*, allowing other employees, including managers, to perpetuate false narratives and exclude her from key meetings and communications related to her role and appropriate for her level and scope, in an effort to constructively dismiss or "cancel" her.

104. Defendant further retaliated by misusing the "performance management" process to frame her protected activity as a performance issue, labeling Plaintiff a "high-conflict personality," and filing false and unjustified performance reviews directly leading to her wrongful termination.

105. The effect of these practices have been to affect the terms and conditions of employment for Plaintiff, to deprive her of equal employment opportunities, and to otherwise adversely affect her status as an employee because she engaged in protected activity.

106. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary, economic, and reputational harm, for which she is entitled to an award of damages.

107. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages.

108. Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton or recklessly indifferent violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## Count III: Discrimination in Violation of Title VII

109. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

110. Defendant discriminated against Plaintiff on the basis of her race, ethnicity, national origin, color and religion in violation of Title VII by, *inter*

32

*alia*, interfering with her ability to continue performing at the level she had reached by reassigning some of her workload to other team members without her knowledge or consent in order to progressively exclude and isolate her to effectively "manage her out."

111.   Defendant discriminated against Plaintiff on the basis of her race, ethnicity, national origin, color and religion in violation of Title VII by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

112.   Plaintiff exhausted administrative remedies for her claim based on color as it was reasonably related to her claims based on her actual or perceived race, ethnicity, and national origin.

113. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary, economic, and reputational harm, for which she is entitled to an award of damages.

114. As a direct and proximate result of Defendant's unlawful discriminatory conduct and harassment in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress

and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages and other relief.

115. Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton or recklessly indifferent violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

<u>Count IV: Retaliation in Violation of Title VII</u>

116. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

117. Defendant retaliated against Plaintiff by, *inter alia*, allowing other employees, including managers, to perpetuate false narratives and exclude her from key meetings and communications related to her role and appropriate for her level and scope, in an effort to constructively dismiss or "cancel" her.

118. Defendant further retaliated by misusing the "performance management" process to frame her protected activity as a performance issue, labeling Plaintiff a "high-conflict personality," and filing false and unjustified performance reviews directly leading to her wrongful termination.

119. The effect of these practices have been to affect the terms and conditions of employment for Plaintiff, to deprive her of equal employment

opportunities, and to otherwise adversely affect her status as an employee because she engaged in protected activity.

120. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary, economic, and reputational harm, for which she is entitled to an award of damages.

121. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages.

122. Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton or recklessly indifferent violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

### Count V: Discrimination in Violation of the Florida Civil Rights Act

123. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

124. Defendant discriminated against Plaintiff on the basis of her race, ethnicity, national origin, color and religion in violation of Fla. Stat. §§760.01-760.11 and 509.092, comprising the Florida Civil Rights Act (FCRA) by, *inter alia*, interfering with her ability to continue performing at the level she had reached by reassigning some of her workload to other team members without her knowledge or consent in order to progressively exclude and isolate her to effectively "manage her out."

125. Defendant discriminated against Plaintiff on the basis of her race, ethnicity, color and religion in violation of the FCRA by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, frequent, severe and pervasive discrimination and harassment.

126. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, monetary, economic, and reputational harm, for which she is entitled to an award of damages.

127. As a direct and proximate result of Defendant's unlawful discriminatory conduct and harassment in violation of the FCRA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress

and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages and other relief.

128.  Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton or recklessly indifferent violations of the FCRA, for which Plaintiff is entitled to an award of punitive damages.

Count VI: Retaliation in Violation of the Florida Civil Rights Act

129.  Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

130.  Defendant retaliated against Plaintiff by, *inter alia*, allowing other employees, including managers, to perpetuate false narratives and exclude her from key meetings and communications related to her role and appropriate for her level and scope, in an effort to constructively dismiss or "cancel" her.

131.  Defendant further retaliated by misusing the "performance management" process to frame her protected activity as a performance issue, labeling Plaintiff a "high-conflict personality," and filing false and unjustified performance reviews leading to her wrongful termination.

132.  The effect of these practices have been to affect the terms and conditions of employment for Plaintiff, to deprive her of equal employment

37

opportunities, and to otherwise adversely affect her status as an employee because she engaged in protected activity.

133.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, monetary, economic, and reputational harm, for which she is entitled to an award of damages.

134.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of damages.

135.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton or recklessly indifferent violations of the FCRA, for which Plaintiff is entitled to an award of punitive damages.

## Count VII: Family Medical Leave Act - Interference

136.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

137. Plaintiff is an individual entitled to protection under the Family and Medical Leave Act (FMLA), 29 U.S.C. §2601, *et seq.*

138. Plaintiff is an eligible employee within the meaning of the FMLA because Plaintiff worked for Defendant for twelve (12) months and had at least 1,250 hours of service for the Defendant during twelve (12) months immediately preceding her FMLA leave.

139. Plaintiff is a covered employee within the meaning of FMLA.

140. Defendant's actions interfered with Plaintiff's lawful exercise of her FMLA rights and constitute violations of the FMLA.

141. As a result of Defendant's unlawful actions Plaintiff has suffered damages.

142. Defendant's unlawful, knowing, and reckless disregard for Plaintiff's rights constitute willful violations of the FMLA, for which Plaintiff is entitled to an award of liquidated damages.

## Count VIII: Family Medical Leave Act - Retaliation

143. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

39

144. Defendant retaliated against Plaintiff in violation of the FMLA in that Plaintiff's request for time off and utilization of qualified FMLA leave was a substantial or motivating factor that prompted Defendant to label her an underperformer and justify further adverse actions leading to her termination.

145. Defendant's actions constitute a violation of the FMLA.

146. Defendant's unlawful, knowing, and reckless disregard for Plaintiff's rights constitute willful violations of the FMLA, for which Plaintiff is entitled to an award of liquidated damages.

147. Defendant's actions were motivated in part by the ongoing discrimination, harassment and retaliation based on Plaintiff's race, ethnicity, national origin, color and religion.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, NIVINE K. ZAKHARI, respectfully requests all legal and equitable relief allowed by law including judgment against Defendant, MICROSOFT CORPORATION for:

a. A declaratory judgment that the actions of Defendant complained of herein violate the laws of the United States and the State of Florida;

b. An injunction and order permanently restraining Defendant, their officers, managers, employees, and all persons in active concert or participation with them from engaging in such unlawful conduct;

c. An order requiring Defendant to institute and carry out policies, practices, and programs to eradicate the effects of its past and present unlawful employment practices;

d. An award of damages against Defendant, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings, emotional pain and suffering and emotional distress, harm to her professional and personal reputations and loss of career fulfillment;

e. An award of punitive damages in an amount to be determined at trial;

f. Liquidated damages as applicable to the FMLA claims;

g. Prejudgment interest on all amounts due;

h. Attorneys' fees and costs that Plaintiff incurs in this action to the fullest extent permitted by law; and

i. For any other and further relief this Court deems just and proper.

## **JURY TRIAL DEMANDED**

148.    Plaintiff, NIVINE KAMAL ZAKHARI, requests a jury trial on all issues so triable by this Complaint.

Dated this 28th day of November 2025.

Respectfully submitted,

*/s/ Nivine K. Zakhari*
**NIVINE K. ZAKHARI**
Florida Bar No.: 48825
3001 N Rocky Pt Dr E, Suite 200
Tampa, FL 33607
Telephone (813) 358-4600
Facsimile (866) 517-7912
nivine@zakhari.com

*Plaintiff*

42

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 28, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Nivine K. Zakhari
Nivine K. Zakhari
*Plaintiff*

## SERVICE LIST

Beth S. Joseph
Florida Bar No. 62952
Email: beth.joseph@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131-3075
Telephone: 305.415.3308
eFacsimile: 305.415.3001
Lead Counsel for Defendant